## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

DESERIE M. CROSSLEY )
)
               Plaintiff, )
        v. )
)    CIV. NO.: 1:07-cv-00017
CHRIST ELLIOT and KEVIN RAMES, )
)
              Defendants. )
_____)

## MEMORANDUM OPINION AND ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Finch, Senior Judge

### I.    Introduction

This matter comes before the Court on Defendants Kevin Rames and Chris Elliot's ("Defendants") Motions for Summary Judgment against Plaintiff Deserie M. Crossley ("Plaintiff").[1] Plaintiff has brought claims against Defendants for violations of the Fair Labor Standards Act ("FLSA"), breach of their alleged personal guarantees to pay her wages, and fraudulent representations they allegedly made to her. Defendants seek summary judgment on all of Plaintiff's claims. Plaintiff opposes Defendants' motions.[2] For the reasons discussed below, the Court grants summary judgment in favor of Defendants on Plaintiff's FLSA claim.

---

[1] Defendants Rames and Elliot filed separate motions for summary judgment based on the same facts and legal arguments. (*See* Case No. 1:07-cv-00017, Docs. 146 and 152.) Plaintiff filed nearly identical oppositions to those motions. (*See* Docs. 161 and 165.) The Court will address both Motions for Summary Judgment in this memorandum opinion.

[2] The Court finds that a hearing would not materially assist it in resolving these motions.

The Court declines to exercise supplemental jurisdiction over her remaining local law claims and dismisses them without prejudice.

## II.   <u>Factual Background</u>[3]

In 2004, Island Lynx Ferry Company, LLC ("Island Lynx") was formed as a limited liability company (under the name Caledonia Ferry Company) under the laws of the Virgin Islands.  (Affidavit of Kevin Rames ¶¶ 1-2, Doc. 148-3.)  Its principle purpose was to provide ferry service between St. Croix and St. Thomas.  (*See* Articles of Incorporation § 5, Doc. 148-1.)[4]  Island Lynx began operations on March 8, 2006 and operated until September 22, 2006, when its ferry boat was seized by its owner for non-payment of the charter agreement.  (Rames Aff. ¶ 4.)

At its inception, Island Lynx had five members with membership interests as follows: Robert Siebengartner (75%), Christopher Elliot (11%), Kevin Rames (9%), Nivene LaRose (3%), and David U. Elliot (2%).  (*Id.* ¶¶ 2-3; *see also* Operating Agreement § 1.01, Doc. 150-1.)  On September 21-22, 2006, Chris Elliot, Nivene LaRose and David U Elliot sold their membership interests to Defendant Rames for $3,000.  (Rames Aff. ¶ 5.)  On October 17, 2006,

---

[3] These facts are taken from the parties' statements of undisputed facts.  (*See* Docs. 148, 150, 154, and 162.)  Because this opinion only addresses the merits of Plaintiff's FLSA claim, the Court will only repeat the facts relevant to that claim.

[4] Plaintiff objects to Defendants' reliance on the Articles of Incorporation and Operating Agreement on the basis that "there is no evidence that [the documents] [are] true and correct cop[ies]."  (*See* Plt's Response to Defendant Rames' Statement of Undisputed Facts at 1-2, Doc. 162.)  However, Defendant Rames avers that these documents are "true and correct cop[ies]."  (*See* Defendant Rames' Amended Statement of Undisputed Facts at 1, Doc. 150-2.)  The record establishes that Defendant Rames, who was indisputably a member of Island Lynx at its inception, is competent to authenticate these founding documents.  *See* Fed. R. Civ. P. 56(c)(4).

Defendant Rames sold his consolidated membership interest to Robert Siebengartner for $4,000. (*Id.*)

Per its Articles of Incorporation and Operating Agreement, Robert Siebengartner was the sole manager and Chief Executive Officer of Island Lynx.  (*See* Articles of Incorporation §§ 6.01, 7; Operating Agreement §§ 8.01, 9.01.)  Defendant Rames was designated as Island Lynx's General Counsel.  (Operating Agreement § 9.01.)  The Operating Agreement provides that "the Manager has sole authority to manage the Company and is authorized to make any contracts, enter into any transactions, and make and obtain any commitments on behalf of the Company to conduct or further the Company's business."  (Operating Agreement § 8.04(a).)  The Operating Agreement also provides that unless authorized by the manager, members may not "make any contracts, enter into any transactions, or make any commitments on behalf of the Company." (Operating Agreement § 8.07.)

Plaintiff began working at Island Lynx as a ticket agent in February 2006.  (Affidavit of Deserie Crossley ¶ 2, Doc. 162-1.)  She earned $20 an hour and worked approximately forty hours a week. (*Id.*)  Some Island Lynx employees, including Plaintiff, were paid in cash.  (*Id.* ¶ 3; Affidavit of David Drake ¶ 3, Doc. 162-2.)  Robert Siebengartner would call Plaintiff on payday and inform her of the amount of taxes that Island Lynx was withholding.  (Crossley Aff. ¶ 5.)[5] At some point during her employment, Plaintiff worked overtime but was not paid time-and-a-half for those hours.  (*Id.* ¶ 6.)

---

[5] Plaintiff alleges that these tax payments were not forwarded to the Virgin Islands Bureau of Internal Revenue.  (Crossley Aff. ¶ 5.)

3

In April 2006, Plaintiff and another ticket agent, Lydia Nichols, were assigned to work at the ticket counter in St. Thomas.  (*Id*. ¶ 7.)  During this assignment, Plaintiff had to pay for meals, taxi fare, and lodging out of her own pocket.  (*Id*.)  Defendant Rames assured her that she would be reimbursed for these out-of-pocket expenses.  (*Id*. ¶ 8.)[6]  She turned in her receipts to Robert Siebengartner but was never reimbursed.  (*Id*.)

Island Lynx suffered regular cash flow problems.  (Drake Aff. ¶ 13.)  As a result of its debt problems, it could only purchase fuel with cash. (*Id*.)  Instead of completely filling up the ferry's fuel tanks, Island Lynx would purchase just enough fuel in St. Croix to complete the journey to St. Thomas and use proceeds from ticket sales to purchase enough fuel to return to St. Croix.  (*Id*.)  On one occasion while Drake was on board, the ferry had only one usable engine because the other two had filled with water due to low fuel levels.  (*Id*.)

In or around May 2006, Island Lynx fell behind (by several weeks) paying its employees. (Drake Aff. ¶¶ 6-7; Affidavit of Copley Evans ¶ 7, Doc. 162-3.)  Disgruntled by the lack of payment, the employees decided to hold a strike.  (Drake Aff. ¶ 10; Evans Aff. ¶ 7.)  On May 6, 2006, shortly after the employees decided to hold a walkout, Defendants called a meeting with the employees and asked them to voice their concerns.  (Crossley Aff. ¶ 9; Drake Aff. ¶¶ 10-11; Evans Aff. ¶¶ 7-8.)  At the meeting, the employees, including Plaintiff, told Defendants that they were not getting paid on time, were not getting paid overtime, Social Security payments were not being made by the company, and taxes were being deducted by the company from their pay but not forwarded to the Virgin Islands Bureau of Internal Revenue.  (Crossley Aff. ¶ 9; Drake Aff. ¶ 11; Evans Aff. ¶ 8.)

---

[6] Plaintiff avers that Rames "personally" promised to pay her for these expenses at the May 6, 2006 meeting. (Crossley Aff. ¶ 11.)

At this meeting, Defendant Rames identified himself as part owner of the ferry, a partner in Island Lynx, and "one of the top people responsible for the boat." (Crossley Aff. ¶ 9; Drake Aff. ¶ 11.)[7]  Referring to himself and Elliot, Rames stated, "[w]e are part owners of this company and I invested too much money in this company for it to go under and so we are going to make sure you all get paid and resolve this as soon as possible." (Second Affidavit of Deserie Crossley ¶ 6, Doc. 167-4.) Defendant Rames also stated he was "going to get the accountant to investigate what [the employees] were owed" and that "he would pay [the employees] for what they were owed if Bob Siebengartner did not."[8] (Crossley Aff. ¶ 9; *see also* Evans Aff. ¶ 11; Drake Aff. ¶ 8.) Defendant Rames acknowledged that they had heard many complaints against Bob Siebengartner, the managing partner, and "from now on [he and Elliot] were going to participate in the management of the business and oversee the running of the business." (Crossley Aff. ¶ 9; Drake Aff. ¶ 11; Evans Aff. ¶ 8.)[9]  Based on Rames' personal guarantee that he would pay "all the money owed to [them]," the employees went back to work. (Crossley Aff. ¶ 10; Drake Aff. ¶ 11; Evans Aff. ¶ 9.)[10]

Plaintiff's last day of work was in October 2006.  That month, Robert Siebengartner informed Plaintiff that she could not go to work because the ferry was being repaired in Tortola. Mr. Siebengartner did not tell Plaintiff how long the repairs would take. (Crossley Aff. ¶ 13.) Plaintiff "heard" that the real reason why the ferry was in Tortola was because it had been seized

---

[7] Plaintiff also avers that Defendant Rames rode the ferry three times and "would always introduce himself as part owner of the boat and ride in first class." (Crossley Aff. ¶ 12.)

[8] Drake and Evans aver that Defendant Rames also stated that he "would personally pay [the employees] all the money owed to [them] if [they] continued to work." (Drake Aff. ¶ 11; Evans Aff. ¶ 8.)

[9] Plaintiff claims that, at the meeting, Defendant Elliot did not refute any of the representations made by Defendant Rames and nodded his agreement. (Second Crossley Aff. ¶¶ 4-7.)

[10] Defendants acknowledge attending a meeting with the employees in May 2006, but deny making any of the representations alleged by Plaintiff.

by its owner for lack of payment by Island Lynx.  (*Id.* ¶ 14.)   Plaintiff did not receive a termination letter or severance pay. (*Id.* ¶¶ 16, 19.)  Because she believed the ferry would continue operation, she did not apply for another job for three weeks. (*Id.* ¶ 17.)

Plaintiff claims that Robert Siebengartner prepared a written spreadsheet wherein he agreed that he owed her $11,288.60 in back wages.  (*Id.* ¶ 21.)  Just before Christmas of 2006, Mr. Siebengartner told Plaintiff he would "pay [her] at 1pm at the ferry dock after he had a meeting with the Governor, Kevin Rames, and Chris Elliot."  (*Id.* ¶ 20.) She went to the dock and waited until 3 p.m.  Mr. Siebengartner never showed up and never called her.  (*Id.*)

## III.   <u>Summary Judgment Standard of Review</u>

"Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Nicini v. Morra*, 212 F.3d 798, 805-806 (3d Cir. 2000) (en banc); *see also* Fed. R. Civ. P. 56(a).   "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which that party has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is deemed genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In reviewing the evidence, the court may not weigh the evidence and must give the nonmoving

party the benefit of all reasonable inferences. *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citations omitted); *Bray v. Marriott Hotels*, 110 F.3d 986, 989 (3d Cir. 1997).

**IV.**   <u>**Analysis**</u>

In her First Amended Complaint ("FAC"), Plaintiff brings three causes of action against Defendants:[11] a claim under the FLSA for failure to pay regular and overtime wages (FAC ¶¶ 33-35, Doc. 134-2); a claim under Virgin Islands law for fraud based on Defendants' alleged promise to pay her past and future wages and expenses if Islands Lynx did not (*id.* ¶¶ 36-41); and a claim under Virgin Islands law for breach of Defendants' alleged guarantee to pay her unpaid wages, overtime and expenses. (*Id.* ¶¶ 42-46.)

Defendants move for summary judgment on all three claims. First, Defendants contend that Plaintiff has failed to provide evidence sufficient to show that they are her "employers" for the purposes of the FLSA. Second, they argue that they cannot be held personally liable for the acts of Island Lynx under the Virgin Islands' Uniform Limited Liability Company Act. Third, Defendants argue that their alleged promise to Plaintiff to pay the debts of Island Lynx is within the statute of frauds and thus void. Finally, Defendants argue that Plaintiff lacks evidence of their fraudulent intent or that she justifiably relied on their alleged promises.

---

[11] Plaintiff initially filed her complaint against Rames, Elliot, Robert Siebengartner and Island Lynx. (*See* Complaint, Doc. 1.) However, in Spring 2007, Island Lynx declared bankruptcy and Robert Siebengartner died. (*See* Certificate of Death, Doc. 148-6; Island Lynx Petition for Bankruptcy, Doc. 148-8.) Plaintiff's FAC, filed in May 2010, does not list Island Lynx or Siebengartner as defendants.

a. **Plaintiff Has Not Shown that Defendants Were Her "Employers" For the Purposes of the FLSA**

The Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, requires that "employers" pay their employees at least the minimum wage and one and one-half times the regular rate of pay for any hours worked in excess of forty hours per week.  29 U.S.C. §§ 206(a) & 207(a); *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 279 (3d Cir. 2010) (citing 29 U.S.C. § 207(a)).  The FLSA also provides a civil cause of action to an aggrieved employee:

> Any *employer* who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages

29 U.S.C. § 216(b) (emphasis added).

Defendants, who were members of Island Lynx, LLC, during most of Plaintiff's employment, challenge whether they may be held personally liable as "employers" under the FLSA.  The FLSA defines "employer"[12] to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).[13]  Taken literally, this definition could include anyone in an employee's chain of command, ranging from executives, board members and managers, down to low level supervisors.  However, "individuals ordinarily are shielded from personal liability when they do business in a corporate form, and [] it should not lightly be inferred that Congress intended to disregard this shield in the context of

---

[12] The FLSA defines "employ" as including "to suffer or permit work."  29 U.S.C. § 203(g).
[13] The FLSA allows for the possibility of multiple "employers."  *See Falk v. Brennan*, 414 U.S. 190, 195 (1973) (finding that apartment building owners and apartment management company were "employers" of building maintenance workers for FLSA purposes).

8

the FLSA." *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 677 (1st Cir. 1998) (citing *Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir. 1983)).

In determining whether an employer-employee relationship exists for the purposes of assessing individual liability for FLSA violations, "the Supreme Court has emphasized that the courts should look to the economic realities of the relationship." *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)) (resolving issue of whether plaintiff was an "employee" or an "independent contractor" for FLSA purposes). Courts have fashioned several tests for determining these "economic realities," all of which focus on the amount of control the alleged employer has over the employee's working conditions. *See, e.g., Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) (focusing on whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records); *see also Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 34 (1st Cir. 2007) (examining "the individual's ownership interest, degree of control over the corporation's financial affairs and compensation practices, and role in causing the corporation to compensate (or not to compensate) employees in accordance with the FLSA." (citing *Baystate Alternative Staffing, Inc.*, 163 F.3d at 675) (internal quotations and brackets omitted)). "[T]he overarching concern is whether the alleged employer possessed the power to control the workers in question." *Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). No single factor controls and courts are instructed to consider the "circumstances of the whole activity." *Selker Bros., Inc.*, 949 F.2d at 1293 (citation omitted); *see also Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009) (same).

9

Defendants argue that they cannot be held individually liable under the FLSA because they did not manage Island Lynx's day-to-day functions nor control Plaintiff's employment conditions.  In support of this contention, they have come forward with evidence that Robert Siebengartner was responsible for managing the day-to-day operations of Island Lynx including "hiring and firing employees, determining rates of pay, establishing and maintaining all banking relationships for [Island Lynx], entering into contracts with persons or corporations, accounting for the financial performance of [Island Lynx] and making financial and scheduling commitments for [Island Lynx]." (Rames Aff. ¶¶ 6; First Affidavit of Chris Elliot ¶ 6, Doc. 148-4; Operating Agreement §§ 8.01, 8.04(a), 8.07, 9.01 (providing that Robert Siebengartner is the manager of Island Lynx with "sole authority to manage the Company.").)  They also aver that they had no role in or responsibility for establishing or maintaining Plaintiff's employment conditions and had no involvement in employee compensation or payroll functions. (Rames Aff. ¶¶ 7-8; Elliot Aff. ¶¶ 7-8; Second Affidavit of Chris Elliot ¶ 11, Doc. 154-1.)  The Court finds that this is sufficient evidence to shift the burden to Plaintiff to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in [her] favor" regarding her contention that Defendants were her "employers."  *Ridgewood Bd. of Educ.,* 172 F.3d at 252.

Plaintiff claims that Defendants' representations and actions at the May 6, 2006 meeting are evidence "that they could change the conditions of employment . . ." and indicate "that Defendants were Plaintiff's employers . . ." (Plt's Opp. at 52, Doc. 161.)  Specifically, Plaintiff points to evidence that Defendants called the May 6, 2006 meeting, knew Plaintiff and other employees were not being paid and made various representations at that meeting including that they were responsible for the boat, had authority to bind the company, would make sure

Plaintiff's wages were paid, would use an accountant to investigate what employees were owed, and, moving forward, were going to participate in the management of the business.[14]

The Court is unaware of any case in which FLSA liability arose out of a single meeting between an employee and an alleged employer. Indeed, the parties' briefs and the Court's own research indicate that, nearly universally, an alleged employer must exert substantial control over a company's day-to-day operations or the plaintiff's employment conditions in order to face liability under the FLSA. *See Falk v. Brennan*, 414 U.S. 190, 195 (1973) (finding that apartment management company could be held liable as an "employer" under FLSA when it "hire[d] and supervise[d] [the] employees" and had "substantial control of the terms and conditions of the work of the[] employees."); *Selker Bros.*, 949 F.2d at 1293 (3d Cir. 1991) (finding FLSA liability where alleged employers (the Selker Brothers) had "pervasive control . . . over the day-to-day operations of the stations . . . visited each station regularly to oversee its operations . . . [and] participated in decisions to hire and pay at least four mechanics."); *Lambert v. Ackerley*, 180 F.3d 997, 1001-2, 1012 (9th Cir. 1999) (en banc) (affirming individual liability under the FLSA against company executives where they had "operational control of significant aspects of the corporation's day-to-day functions; the power to hire and fire employees; the power to determine salaries; and the responsibility to maintain employment records."); *RSR Sec. Services Ltd.*, 172 F.3d at 140 (1st Cir. 1999) (upholding individual liability against chairman of the Board of a

---

[14] Plaintiff also asserts that Defendant Rames was her "employer" because he physically handed her a W-2 when she was hired and was "often working in the office and discussing matters with Robert Siebengartner." (Plt's Opp. at 52.) However, in support of these allegations, Plaintiff cites to paragraphs (¶¶ 25-26) which do not appear in any of the affidavits she filed in support of her opposition to summary judgment (or any affidavit that the Court is aware of, for that matter). (*See* Crossley Aff.; Second Crossley Aff.) As these allegations are unsupported with evidence, the Court cannot consider them. *See Betts v. New Castle Youth Development Center*, 621 F.3d 249, 252 (3d Cir. 2010) ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment.") (citation omitted).

private security firm when he "exercised financial control over the company," "had the authority to hire employees," assigned guards to work different locations, signed payroll checks on at least three occasions, and frequently instructed corporate president and vice president on running the company); *United States Dep't of Labor v. Cole Enters., Inc*., 62 F.3d 775, 778-79 (6th Cir. 1995) (finding that corporation's president was "employer" within FLSA where he had "operational control" over the enterprise, ran business, issued checks, maintained records, determined employment practices and was involved in scheduling hours, payroll and hiring employees); *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994) (imposing individual liability for FLSA violations on defendant because he "was chief executive officer of Foremost . . . controlled significant functions of the business, and determined salaries and made hiring decisions."); *Reich v. Circle C. Investments, Inc*., 998 F.2d 324, 329 (5th Cir. 1993) (affirming liability for FLSA violations against nightclub operator when there was evidence that he was "the driving force behind [the company]," hired employees, gave specific instructions to employees, removed money from company's safes, "signed employees' payroll checks," ordered one employee to refrain from keeping certain payroll records, and issued inter-office memorandum concerning fines for employee rule infractions); *Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986) ("To be personally liable, an officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee."); *Donovan v. Grim Hotel Co*., 747 F.2d 966, 972 & n.7 (5th Cir. 1984) (holding hotel corporations' president personally liable for FLSA violations because "he began and controlled the hotel corporations . . . held their purse-strings and guided their policies. It was only he who could authorize compliance with the Fair Labor Standards Act. He personally selected the manager of every hotel" and had "ultimate control over wages"); *Bonnette*, 704 F.2d at 1470 (finding

individual liability when there was evidence that alleged employers directly paid employees, "controlled the rate and method of payment. . . maintained employment records . . . [and] exercised considerable control over the structure and conditions of employment by making the final determination . . . of the number of hours each chore worker would work and exactly what tasks would be performed."); *see also Kwee Ling Tan v. Mr. Pi's Sushi, Inc.*, 2010 WL 5392754, at *5 (D.N.J. 2010) (unpublished) ("[T]he *sine qua non* of employer status under the FLSA is day-to-day control over a business's operations . . .").[15]

---

[15] The district court cases cited by Plaintiff in support of her argument that FLSA liability can be imposed on Defendants similarly all involved substantial evidence that the individuals in question had significant control and involvement in the day-to-day management of the business and setting employment conditions. *See, e.g., Dole v. Simpson*, 784 F. Supp. 538, 546-47 (S.D. Ind. 1991) (finding that there was a question of fact whether Simpson was liable as an "employer" under the FLSA when there was deposition testimony that "no substantive decisions were made without his approval," that he "had hired most of the executive-level employees . . . determined weekly whether there would be any cash in Alpha's accounts . . . controlled whether Alpha had funds sufficient to meet payroll during the period in question . . . [and] had control over which accounts payable would be satisfied whenever Alpha did have funds to disperse."); *Dole v. Solid Waste Services, Inc*., 733 F. Supp. 895, 901 (E.D. Pa. 1989) *aff'd*, 897 F.2d 521 (3d Cir. 1990) (finding "employer" liability under the FLSA for three individuals who "set pay practices for company [] and the budget for payroll . . . manage[d] existing facilities, overs[aw] the construction of new facilities and purchasing. . . inform[ed] employees about wage rates and practices . . . hire[d] employees . . . direct[ed] employees' work hours . . . set[] wage rates for [] employees. . . .[and] answer[ed] employee inquiries concerning wages and employment policies."); *Dole v. Haulaway Inc*., 723 F. Supp. 274, 287 (D.N.J. 1989) (holding that "president and sole shareholder of the corporate defendant" was "employer" under FLSA because "[i]n addition to holding corporate authority, Mr. Scugoza actually exercised day to day control over the affairs of the corporate defendant including approving promotions and raises, hiring and discharging employees, and establishing other terms and conditions of employment."); *Maldonado v. Lucca*, 629 F. Supp. 483, 487-88 (D.N.J. 1986) (finding that Lucca was "employer" of migrant and seasonal blueberry pickers when he "designed, implemented and ultimately controlled the picking process and the payment system . . . spent considerable time in the fields monitoring workers and crew leaders and at least twice instructed a crew leader to dismiss a worker . . . selected the area of the fields where each crew worked on any given day and had the sole authority to transfer a crew to a new field."); *Gusdonovich v. Business Information Co.*, 705 F. Supp. 262, 268 (W.D. Pa. 1985) (upholding FLSA verdict against individual defendants because "the uncontradicted evidence as well as the stipulations of the parties showed that these three individuals were the sole owners of the corporation. They were

Here, Plaintiff has not established that Defendants controlled the day-to-day activities of Island Lynx or her working conditions. Her evidence on this score consists of one employee meeting with Defendants and three "first class" boat rides by Defendant Rames.[16] The May 6, 2006 meeting included representations that Defendants were "*going*" to consult with the accountant to determine how much the employees were owed and "from now on [] were *going* to participate in the management of the business." (Crossley ¶ 9.) However, unlike the cases mentioned above, Plaintiff has produced no evidence that Defendants actually were enmeshed in Island Lynx's day-to-day operations. *See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.,* 515 F.3d 1150, 1161 (11th Cir. 2008) (holding that individual liability under FLSA was not warranted when evidence showed that alleged racetrack employer only visited racetrack once a year and did not take an "active role in the day-to-day operations" of the racetrack). Liability under the FLSA derives from the "exercise[] [of] economic and operational control over the employment relationship," not the mere promise to do so. *Lambert*, 180 F.3d at 1012.[17]

_____

also its officers, and as such, responsible for operating and managing the corporation's day to day affairs. Moreover, the defendants themselves testified that they hired the plaintiff, set the hours of employment, and established wages."); *see also Brock v. VAFLA Corp.*, 668 F. Supp. 1516, 1518-20 (M.D. Fla. 1987) (imposing personal liability for FLSA violation on amusement park manager when he "overs[aw] the operation of the amusement park on a day to day basis . . . determined the number and duties of employees, hired and fired employees and set the wage rates of new employees . . . occupied an office at the park site wherein payroll records and records of hours worked were maintained and where the payroll checks were prepared and handed out to employees.").

[16] Defendant Rames' three trips on the ferry do not inform whether he was involved in Island Lynx's day-to-day functions or Plaintiff's employment conditions.

[17] Some Courts suggest that the inquiry should focus on whether the alleged employer had the authority to control the employment relationship and not necessarily whether he or she did exercise that control. *See RSR Sec. Services Ltd.*, 172 F.3d at 140; *but see Alvarez Perez,* 515 F.3d at 1161 (holding that "unexercised authority is insufficient to establish liability as an employer.") Assuming that unexercised authority is enough, Plaintiff has not shown that Defendants had authority to make decisions concerning her employment conditions. The Operating Agreement specifically designates Robert Siebengartner as manager and reserves solely to him managerial powers. (Operating Agreement §§ 8.01, 8.04(a), 8.07 & 9.01.)

Furthermore, Plaintiff has satisfied none of *Bonnette*'s employment condition factors. There is no evidence that Defendants had the power to hire or fire Plaintiff, supervised and controlled her work schedule or her conditions of employment, determined her wages, or maintained employment records. *Bonnette*, 704 F.2d at 1470.

In fact, Plaintiff's own evidence shows that Robert Siebengartner, not Defendants, was responsible for the day-to-day functions of Island Lynx, including payroll and employment decisions. *See Patel*, 803 F.2d at 638 (affirming district court's judgment that president of company (Wargo) was not plaintiff's "employer" for FLSA purposes because plaintiff was hired by Babowicz and plaintiff acknowledged that Babowicz "was in charge of the day-to-day operation of the facility.") For example, Plaintiff states that Siebengartner paid the employees and called them on payday to inform them of the amount of taxes being withheld from their paychecks.[18] (Crossley Aff. ¶ 5.)   David Drake, Plaintiff's coworker, avers that it was "Siebengartner who fell behind on paying the employees [sic] wages," precipitating the threatened walkout. (Drake Aff. ¶ 7.) Plaintiff acknowledges that, at the May 2006 meeting, Rames identified Siebengartner as "the managing partner." (*Id*. ¶ 9.) The thrust of her complaint against Defendants is that they breached their promise to pay her "what [she] was owed *if Bob Siebengartner did not*." (*Id*.) (emphasis added).  Plaintiff continued to look to Siebengartner for her unpaid wages months after this promise was made, when, in December

---

[18] Copley Evans, another coworker of Plaintiff, avers that Island Lynx garnished child support from his wages but did not forward those deductions to the Virgin Islands Department of Justice. (Evans Aff. ¶ 8.)  Evans requested that the Department of Justice contact Island Lynx to investigate.  Correspondence from the Department of Justice, Paternity and Child Support Division (PCSD), indicates that it had "numerous communications with a Mr. Bob Seibengarten [sic] regarding the payments of Mr. Evans' child support, but no avail. All PCSD got were promises to pay." (*See* April 17, 2007 Letter from PCSD, Doc. 162-4.)  This is a further indication that Siebengartner was responsible for Island Lynx's payroll functions.

2006, she went to meet Siebengartner in an effort to collect her money and he failed to show up. (*Id*. ¶ 20.)  Tellingly, Plaintiff acknowledges that Siebengartner was the one who instructed her that she could no longer come to work in October 2006. (*Id*. ¶ 13.)  And the $11,288.60 that she is allegedly due in back wages is evidenced by a spreadsheet "written *by Siebengartner* [and] is the agreement *between Mr. Siebengartner and me* and about how much *he* owed me."  (*Id*. ¶ 21) (emphasis added).  While this evidence is sufficient to create an issue of fact as to whether Siebengartner was Plaintiff's "employer," it lends no support to Plaintiff's claims that Rames and Elliot were her "employers."  The Court declines to infer that Defendants had control over Island Lynx's day-to-day operations or Plaintiff's working conditions based on the single May 6, 2006 meeting, particularly in light of evidence to the contrary.  *See Estate of Oliva ex rel. McHugh v. New Jersey,* 604 F.3d 788, 800 (3d Cir. 2010) (on summary judgment, finding that inference was unreasonable when it conflicted with statements made by plaintiff); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 210 (3d Cir. 2001) (noting that in evaluating a motion for summary judgment "a court is required to indulge only reasonable inferences."); *see also Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451, 468 (1992) (noting that in opposing summary judgment, "the nonmoving party's inferences [must] be reasonable in order to reach the jury.").

The question remains as to whether Defendants' representations that they would personally pay Plaintiff her wages if Siebengartner did not are sufficient to hold them liable under the FLSA.  Plaintiff claims that this promise is what made her (and her fellow employees) return to work.  Citing *Donovan v. Agnew,* 712 F.2d 1509 (1st Cir. 1983), Plaintiff argues that Defendants can be held individually liable because they "made a personal and self-interested decision to keep the employees working, despite the fact that they knew the company could not

pay them . . ." (Plt's Opp. at 53.)  In *Agnew*, the Secretary of Labor of the United States brought

an FLSA action for unpaid employee wages against Maxim Industries, Inc., a fire truck

manufacturer, and Agnew and Bradley, the owners of Maxim, Inc., which wholly owned Maxim

Industries, Inc.  *Agnew*, 712 F.2d at 1511.  The district court found that defendants Agnew and

Bradley could be held individually liable as "employers" because they:

> both were actively engaged in the management, supervision and oversight of
> Maxim Industries' affairs, including employee compensation and benefits . . .
> Agnew was *personally* responsible for allowing the company's worker's
> compensation insurance to lapse in derogation of its legal responsibility and
> *personally* took responsibility for making banking arrangements when informed
> in late 1980 that Maxim's payroll account could not cover its weekly payroll; []
> Bradley, during the latter part of 1980, *personally* supervised the cash flow of the
> company on a day to day basis, was *personally* involved in decisions about
> layoffs and employee overtime hours . . . Agnew and Bradley as principals of the
> firm knowingly undertook a calculated risk to keep the plant open, in spite of
> layoff recommendations from the bank, the union, and their own managers, and in
> spite of the company's inability fully to fulfill its statutory obligations to its
> employees.

*Id*. (emphasis added).  The First Circuit "narrow[ly]" affirmed the district court, finding that

individual liability under the FLSA could be imposed on "corporate officers with a significant

ownership interest who had operational control of significant aspects of the corporation's day to

day functions, including compensation of employees, *and* who *personally* made decisions to

continue operations despite financial adversity during the period of nonpayment." *Id*. at 1514

(emphasis added).[19]

---

[19]  During the events in question, Defendant Rames had a 9% interest in the LLC while
Defendant Elliot held an 11% interest.  (*See* Operating Agreement § 1.01.)  In contrast, Robert
Siebengartner held a 75% interest. (*Id*.)  While not a dispositive factor, Defendants' interests in
Island Lynx are far less than that in other FLSA cases imposing individual liability on
shareholders.  *Cole Enters., Inc*., 62 F.3d at 777 (imposing liability against individual defendant
when he "and his wife are the co-owners of the corporation, each owning 50% of the shares.");
*Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 966 (6th Cir. 1991) (imposing liability on

Other cases are in accord with *Agnew* and demonstrate that individuals can be held liable for FLSA violations only when they have control over compensation or payroll functions *and* are *personally* involved in decisions which ultimately violate the FLSA.  *See Hotel Oasis, Inc*., 493 F.3d at 34 (finding corporation's president "instrumental in 'causing' the corporation to violate the FLSA" where he had "ultimate control over business's day-to-day operations . . . was the corporate officer principally in charge of directing employment practices, such as hiring and firing employees, requiring employees to attend meetings unpaid, and setting employees' wages and schedules."); *accord Baystate Alternative Staffing*, 163 F.3d at 678 (reversing holding by Department of Labor's Administrative Review Board that company's president and manager could be held liable as "employers" under FLSA because there was no evidence that either individual controlled company's finances or made corporate policy concerning company's compensation practices); *see also Simpson*, 784 F. Supp. at 546-47 (denying defendant's summary judgment motion on issue of whether he was an "employer," because there was evidence that, among other things, "no substantive decisions were made without his approval" and his "independent judgment controlled whether [the company] had funds sufficient to meet payroll during the period in question." (citing *Agnew*, 712 F.2d at 1511)).

Here, unlike *Agnew*, *Hotel Oasis,* and *Simpson*, Plaintiff has not offered evidence that Defendants were personally responsible for Island Lynx's compensation or payroll functions *and* personally decided to keep Island Lynx running despite being unable to meets its payroll.  Even if their alleged promise to pay the employees' wages as a means to avoid a work stoppage can be

---

individual defendant when "he and his wife are co-owners of the corporation."); *Grim Hotel Co*., 747 F.2d at 969 (imposing individual liability when "virtually all of [the hotel corporation's stock] has been owned by [defendant], his wife or their daughters."); *Agnew*, 712 F.2d at 1511 (imposing liability on two individual defendants when they held a combined 100% interest in corporation).

construed as a personal "decision[] to continue operations despite financial adversity," Plaintiff has failed to show that Defendants had "operational control" over Island Lynx's payroll functions or any other "significant aspect of [its] day to day functions." *Agnew*, 712 F.2d at 1511; *see also Baystate Alternative Staffing*, 163 F.3d at 678 (FLSA liability requires evidence that alleged employers were responsible for company's compensation practices).   To the contrary, Plaintiff and her coworkers acknowledge that Siebengartner was responsible for Island Lynx's payroll functions.   Furthermore, Plaintiff's own claims indicate that Island Lynx began violating the FLSA before the May 6, 2006 meeting and Defendants' alleged intervention into Island Lynx's operational affairs.[20]   Plaintiff cites no case (and this Court's research found none) that supports Defendants' FLSA liability in these circumstances.   Defendants' representations, while perhaps actionable under a different cause of action, cannot form the basis of *FLSA* liability.

Consistent with the cases discussed above, the Court finds that the evidence presented by Plaintiff is insufficient, as a matter of law, to demonstrate that Defendants were her "employers" within the ambit of the FLSA.[21]   Accordingly, Defendants are entitled to summary judgment on Plaintiff's FLSA claim.

---

[20] Plaintiff alleges that Island Lynx's failure to pay her overtime began prior to the May 6, 2006 meeting.   (FAC ¶ 17.)   She also claims that the alleged failure to pay minimum wages began as early as March 2006.   (Joint Final Pretrial Statement at 9, Doc. 180.) *See* Fed. R. Civ. P. 56(c)(3) (on summary judgment, a court "may consider other materials in the record.").

[21] When there are "no material facts in question," the issue of whether Defendants were Plaintiff's "employers" under the FLSA is a "matter of law." *Simpson*, 784 F. Supp. at 543 (citing *Elliott Travel & Tours*, 942 F.2d at 965; *Karr v. Strong Detective Agency, Inc*., 787 F.2d 1205, 1206 (7th Cir. 1986); and *Patel*, 803 F.2d at 634).

**b.  The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's Territorial Law Claims**

This Court's subject matter jurisdiction over Plaintiff's complaint arose from her FLSA claim.   29  U.S.C.  §  216(b).    Her  FAC  alleges  no  other  basis  for  federal  subject  matter jurisdiction.  (*See* FAC ¶ 1.)  Plaintiffs remaining claims allege breach of Defendants' payment guarantee and fraud and arise under the laws of the Virgin Islands.  (FAC ¶¶ 36-46.)  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims and will dismiss them without prejudice for several reasons.

First, under 28 U.S.C. § 1367(a), a district court has supplemental jurisdiction over state law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if - the district court has dismissed all claims over which it has original jurisdiction."  Here, the only claim in the FAC over which this Court had original jurisdiction was Plaintiff's FLSA claim. That claim has been dismissed with prejudice. While recognizing its discretion, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims.  *See Parker,* 620 F.3d at 276 ("The District Court was free to decline to exercise supplemental jurisdiction because it 'dismissed all claims over which it [had] original jurisdiction.'") (citing 28 U.S.C. § 1367(c)(3));  *Elkadrawy v. Vanguard Group, Inc.*, 584 F.3d 169, 174 (3d Cir. 2009) (same); *see also Garcia v. Pace Suburban Bus Service, a Div. of Regional Transp. Authority*, 955 F.Supp. 75, 76 (N.D. Ill. 1996) (granting defendants

summary judgment on plaintiff's FLSA claim and dismissing pendant state law claim without prejudice).

Furthermore, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims *unless* considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Bright v. Westmoreland County,* 443 F.3d 276, 286 (3d Cir. 2006) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)) (emphasis added).  Here, not only do those considerations not weigh in favor of exercising supplemental jurisdiction, they weight against it.  The Court is aware that Plaintiff's former coworkers at Island Lynx − Messrs. Drake and Evans − have similar claims pending in the Superior Court and are represented by the same counsel.[22]  (*See* David Drake and Copley Evans v. David Chris Elliot and Kevin Rames, St. Croix Superior Court Case No. 414/2008.)  It would be significantly more efficient for these related claims to proceed in the same forum.

Finally, Plaintiff's fifty-seven page opposition brief indicates that her remaining claims involve potentially complicated issues of local law and statutory construction − including Virgin Islands tax law, corporate veil piercing, statute of frauds, and exceptions to the statute of frauds. (*See* Plt's Opp. at 18-36, 38-42); *see also* 13 V.I.C. § 1303; 28 V.I.C. § 244.  Accordingly, this Court will dismiss her remaining claims.  *See Combs v. Homer-Center School Dist.*, 540 F.3d 231, 254 (3d Cir. 2008) ("Because all federal issues have been decided on summary judgment and since [plaintiffs'] [Religious Freedom Protection Act] claim raises a novel and potentially

---

[22] Defendants Rames (*pro se*) and Elliot are also apparently represented by their same respective counsels.

complex issue of State law, we will decline to exercise supplemental jurisdiction over [plaintiffs'] pendent state law claim.").

**V.**   <u>**Conclusion**</u>

For the foregoing reasons, the Court finds that summary judgment should be granted in favor of Defendants as to Plaintiff's FLSA claim.  The Court declines to exercise supplemental jurisdiction as to her remaining claims and those claims are dismissed without prejudice.

Accordingly, it is hereby

**ORDERED** and **ADJUDGED** that Defendants' Motions for Summary Judgment are **GRANTED** as to Plaintiff's FLSA Claim (Count 1) and that claim is **DISMISSED WITH PREJUDICE**;

**ORDERED** that Plaintiff's remaining claims (Count 2 and 3) are **DISMISSED WITHOUT PREJUDICE;**

**ORDERED** that Defendant Rames and Plaintiff's motions for leave to file oversized briefs (Docs. 145 and 168) are **GRANTED**;

**ORDERED** that Plaintiff's motions for extensions of time (Doc. 159 and 164) are **GRANTED;**

**ORDERED** that Defendant Rames and Plaintiff's motions for leave to file sur-replies (Docs. 173, 174, 175, 176, 177, and 179) are **DENIED.**[23]

**ENTERED** this 25th day of March, 2011.

_____/s/_____
RAYMOND L. FINCH
SENIOR U.S. DISTRICT JUDGE

---

[23] The parties' sur-replies focused on the admissibility of certain evidence that Defendant Rames sought to introduce in support of his motion for summary judgment.  Because the Court did not consider that evidence, the parties' sur-replies are denied as moot.